May it please the Court to reserve three minutes for rebuttal. Your Honors, Petitioner Jiang escaped from China because he was persecuted for being a member of a Christian house church. Once he arrived in the United States, he applied for political asylum and shortly thereafter his mother became a U.S. citizen and he became eligible for a visa as the unmarried son of a U.S. citizen. Counsel, let me short circuit some of this and ask you some remedial questions that are concerned. Can you hear Judge Ripple? Yes, just fine. I'm only speaking for myself, obviously, but it appears to me that there's not substantial evidence to support the BIA's conclusion that your client was married. I think it's clear that he was not married and would therefore be entitled to adjustment of status. What I didn't understand from your brief was whether you thought, in the event that we agree with you on that, whether we still have to go on to decide the other issues or not. Because your prayer for relief seemed to want everything, but I wasn't clear why we would have to do everything if we agreed with that argument. Your Honor, if you mean everything, do you mean the second relief of asylum? I'm having a little problem hearing. Maybe I'm going to go see someone. I'll try to speak louder. No, I'm worried about myself, but I didn't even hear the question clearly. I'll repeat it. Okay. Blanca, can we turn it up? Is it on? My question is if we were to grant the relief of adjustment of status or order that it be granted because he is the unmarried son of a United States citizen, whether we would need to reach the remaining issues in the case? Okay. Your Honor, the initial reason that we appeared in court originally was for adjustment of status, and if that relief is granted, then we would no longer need to go and visit the issues regarding political asylum. May, can you talk just louder for me, please, like you're shouting at me? That would be a good way to do it. Yes, Your Honor. Judge Graber had indicated that she also believed that there was no substantial evidence showing that Jiang was unmarried, that, in fact, he was the unmarried son of a U.S. citizen, wherefore he would be eligible for adjustment of status, and her question was whether then we needed to continue to the second form of relief of political asylum. And I stated that if, in the event that this case would be remanded for further processing for adjustment of status, I believe the second issue of political asylum would not need to be argued. However, I am ready to answer any questions that you have. Well, obviously I was only speaking for me, so you may have questions of a different sort from other members of the panel. So would you like me to proceed regarding adjustment of status? Go ahead. For Jiang to be eligible for adjustment of status, he must be the unmarried son of a U.S. citizen. Jiang, in his asylum application, indicated that he was married. However, the asylum application was prepared not by an attorney who could have analyzed his marital status in a legal manner. When questioned during testimony, he indicated that all he had was a banquet, and witnesses corroborated that he did not register a marriage, and in fact he stated that he purposely did not register a legal marriage in China because he did not want to jeopardize his eligibility for a visa. There are two steps in determining whether he had a legal marriage. The first is to determine what is a legal marriage in China. What constitutes a legal marriage in China? This court in Cavo v. Ilchert has stated that Federal Rules of Civil Procedure 44.1 govern the interpretation and determination of foreign law, specifically that law provides for very flexible procedures for determining and introducing any material evidence so that a fair outcome for the parties can be reached. The rule further states that any material or any source, including testimony, whether or not submitted by the parties and whether or not complying with the Federal Rules of Evidence may be submitted. Furthermore, any evidence and material may be submitted at any time, and courts may engage in their own research in determining foreign law. So the law does give, the rule does give the judge a great deal of flexibility in determining what to consider and not what to consider, is that correct? Yes, Your Honor. Well, then let's talk a little bit about the range of discretion that the immigration judge had here in determining what to consider and what not to consider in making that determination. Your Honor, the judge actually never made a finding stating that the document submitted was not believable or that it was not sufficient to prove the marriage. Here the court could have engaged in its own research to further investigate what Chinese marriage lies. In fact, Jiang provided sufficient evidence, both at the adjustment hearing before the judge, as well as later with the BIA, showing what constitutes a legal marriage in China. Specifically, what the law in China requires is that applicants obtain a registration for marriage, appear before a civil servant officer in China, prove that they're single, show a Chinese ID, show a family health certificate and a family registry book, and most importantly, that they register a marriage with the Chinese government. The second part in determining whether this was valid marriage. And as far as we know, that wasn't done. Yes, Your Honor. This is the second part in determining whether there was a valid marriage, which is the compliance with Chinese marriage. In other words, the answer is, yes, it wasn't done. Yes, Your Honor. It was not done. In fact, the evidence shows that when questioned regarding his marriage, Jiang repeatedly stated that all he had was a banquet, which was a celebration with family and friends, to celebrate his relationship with his girlfriend. The significance that Jiang gives to having had a banquet and what he considers himself as completely irrelevant, what's relevant is whether he complied with Chinese law. And his own testimony and that of witnesses repeatedly show that he did not comply with Chinese marriage law. Most importantly also, two original Chinese government certificates were submitted showing that he was unmarried. In fact, the BIA erred as a matter of law in excluding those two documents for lack of U.S. consular certification. Let me just say, I believe that from what I've combed this record, that he is statutorily eligible for adjustment of status as the unmarried son of a U.S. citizen. And I believe that the documents that Jiang submitted to the IJ prove that he is unmarried, and the documents should have been accepted as proof. And we have this notorial certificate here. I have a copy of it right in my hand. And it states, this is to certify that up to January 26, 2005, no record concerning the marriage registration had been found in Marriage Registration Authority of the domicile of Jiang Ling, male, born February 19, 1971, now residing in, and it goes on and gives his card number. And that's the English translation. And we have a document that's in the Chinese language that has a seal on it. And I believe the original has a red seal on it. And then we have a notarial certification telling us that this is to certify that the English-translated copy attached is in conformity with the Chinese copy, and it's prepared by a notary, the City of Guangzhou and Guangdong Province, January 28, 2005. And then we have the Chinese certification. And then we have an authentication certificate signed by the United States Counselor Office, and a person by the name of Karen Brach, Vice Counsel, on March 16, 2005. And then we have another certificate. It's part of that, 000075. And this should have been admitted, I believe, and I'm just speaking for myself, as a matter of law under Federal Rule 44, Federal Rule of Evidence 44B. And which provides that a lack of a record, a written statement, that a diligent search of designated records revealed no record or entry of a specified tenor is admissible as evidence that the records contain no such record or entry. For domestic records, the statement must be authenticated under Rule 44A1. For foreign records, which this is, the statements must comply with subsection A2C and then the little Roman numeral II, IIIs. And that section tells us that it talks about other means of proof. If all parties have a reasonable opportunity to investigate a foreign record's authenticity and accuracy, the court may, for good cause, either, and then it goes on, permit the record to be evidenced by an attested summary, with or without final certification. And that's what we have here, and that's all in evidence, isn't it? Yes, Your Honor.  And then we have other affidavits, affidavit of single and all the rest of it. Yes, Your Honor. Originally, in October of 2004, at a master calendar hearing, an original affidavit of single issued by the China Family Commission was submitted to the court. We argue that under 8 CFR 1287.6B, that no authentication would actually be required because it was an original document. Although there's not much case law on that issue, there is a case of Cordon versus INS, in which this court ruled that a passport by the Guatemalan government did not need to be authenticated under that regulation because it was an original publication. You don't need to win this argument to prevail, though, do you? This specific thing that you're now arguing about the no need for authentication. Well, we are arguing that, first, that there was no need for authentication. I understand that. Okay. That's what I'm trying to get at. If we were to disagree with you about that principle, what you have to show me. In the alternative, if you believe that these documents had to have been authenticated, then they were sufficiently authenticated under Conn versus INS, which states, as the judge pointed out, that Federal Rule of Civil Procedure 44 applies. Furthermore, in a recent decision, this court, in Vatian versus INS, also decided that a petitioner's own testimony may be sufficient to authenticate a foreign document. That case specifically said that Federal Rule of Evidence 901 and 902 applied. 902 specifically allowing for self-authentication, and Rule 901 stating that should self-authentication not be possible, that any evidence sufficient to satisfy that the document is what it purports to be would satisfy authentication. The record shows that Jiang attempted to self-authenticate the document. Did the judge have the discretion to require something more than self-authentication? Your Honors, we actually also submitted a second original document, a notarial certificate also issued by the Chinese government, in an attempt to authenticate that first document. So the judge actually had two original documents showing that he was unmarried. Furthermore, the first document was submitted approximately five months prior to the merits hearing, and the second document about three months prior to the merits hearing, which would have given the government sufficient time to send the documents to forensics, had there been any question regarding their authenticity. My point is, at one end of the spectrum, you have self-authentication. The other, you have United States consular authentication. There is a range, as you point out, under the federal rule of other forms of certification. And my question to you is, may the judge say, I'm not going to permit you to put this in solely on self-authentication. I'm going to require something else, not necessarily consular authentication, but I'm going to require something else. Does the IJ have that authority? Yes, Your Honor. At the very minimum, she should have at least finished that line of questioning so that he could have attempted to completely self-authenticate. Whether he was then believable or not, that would have been a second issue for the judge. However, she cut him off so that he wasn't even able to complete self-authentication. And then really didn't give a continuance to permit other evidence. Yes, Your Honor. Once it became evident that U.S. consular certification was the only means of authentication that she would accept, the immigration judge then refused a continuance. And a good cause existed for continuance under the four elements outlined in BEARS. The first element being, which was the document that was excluded had a continuance been granted. In this situation, a continuance would have allowed Jiang time to obtain a consular certification, which he, in fact, then obtained 10 days after the mayor's hearing, and he submitted together with a notice of peer to the BIA. What was it? Excuse me. I'm sorry. No, go ahead, sir. No, no, no. I interrupted you. No, I was simply going to change the focus for a moment and ask counsel about the possibility of her client now being eligible for adjustment of status, even as a married man. I understand that now may be a possibility. Is that correct? Your Honor, a petitioner is not legally married. Therefore, he's still the unmarried son of a U.S. citizen and would be eligible for a visa and adjustment of status. I understand that, but even if he were to be married, he would now be eligible. Am I correct, the time, sufficient time has run? I don't believe so, Your Honor. No, if he were married. I'm sorry. My question was going to be whether we had the authority to remand for a determination of that point by the board. Do we have that authority? To remand on the issue of whether he's married or not, Your Honor? I understand your position. Thank you, Judge. You've about doubled your time, and I at least would appreciate hearing from the government. Thank you, Your Honor. Well, no, we can't. You know, this is 10 minutes. That's a ridiculous limitation of time that the court has. I mean, it's an important case. Anything else you want to say? No, Your Honor. Seriously, you know, our court, we've got a huge backlog of these cases. At one time, we had 8,000 of them passed on to us by the Justice Department. We're working on them. It's been a few years, but we just arbitrarily set a 10-minute limit on these cases, which involve thick files and lots of work to go through them. Your Honor, I can continue with how he's eligible. Well, I mean, he is an unnamed, unmarried son of a citizen. He was eligible. Was he eligible on February 22nd, 2001? At the time of the merits hearing in March of 2001, yes, he was eligible for adjustment of status. At that time? Yes, Your Honor. And then if he were married, which you say that has not happened officially, he would have been eligible until the priority date, I think it was 22 July 98, is that correct? Assuming he was married. Your Honor, to be honest, we haven't looked at the issue of if he was married because he's clearly not married. I have it right here. That's the April 2006 visa bulletin. We'd also like to point out that it was not only an abuse of discretion to deny the continuance because he met the four elements outlined in Bayer's. Another case... When the immigration judge talked about further evidence on this subject, what did she say? You've got those pages in the transcript. Your Honor, she specifically... For the first time, she indicated that she required U.S. consular certification. Prior to that... What did she say? She stated that it was not sufficiently authenticated and that we needed U.S. consular certification. Are those her exact words? Yes, Your Honor. This is exactly what happened. In October of 2004, at a master calendar hearing, the government attorney stated that now that he's eligible for adjustment of status, that the issue of his marriage and whether he was single or not became apparent. At that point, Petitioner and his counsel had already obtained the first original certificate from the Family China Planning Commission showing he was single, which we then showed to government counsel. The judge then stated that we should make a copy of those originals and submit it to the government counsel so that the issue could be resolved at the next master calendar hearing in December 2004. Our belief was then that the document would be sent to forensics for them to investigate. However, in December of 2004, at the next master calendar hearing, the government counsel stated that the document needed to be authenticated. In response, Petitioner stated, I could have this original document. I could take it to the Chinese government for authentication. And the judge stated, you should make an attempt to do so. In an attempt to comply with what the judge had asked of him, he then took that document to the Chinese embassy in the United States, who then sent him to the Chinese government in China. And as a response, he obtained a second original document showing that he was unmarried. When we then appeared at the merits hearing in March of 2005, that was the first time that the judge indicated that she required U.S. consular certification. At that point, when we asked for continuance, the judge denied a continuance, which we believe was an abuse of discretion. Well, what did she say when she denied it? She stated that we had ample time to authenticate the document. But so you're saying that it was not clear, just that was when it first became clear what she wanted. Yes, Your Honors. And then your client, were you the lawyer then? Yes, Your Honor. Okay. Then you asked for a 45-day continuance, is that right? Yes, Your Honor. And that was denied? And you sent away for the authentication from the American Council, that's the one I read. Yes, Your Honor. And you got that back in what, about 10, 12 days? Ten days. Ten days, right away you got it. Yes, Your Honor. Once you knew what she wanted, what the IJ wanted, you took care of it, but it wasn't clear until that time. Yes, Your Honor. And that's why the BIA, with the notice to appeal, had the U.S. consular authentication together with the document showing that Petitioner was unmarried and an additional U.S. consular certification of a Chinese government document showing that his girlfriend was unmarried. And it was an abuse of discretion by the BIA to have denied the motion to remand, which was pending at that time. I'm sorry, the first U.S. consular certification showing that the Petitioner was unmarried was submitted with a notice to appeal. Subsequently, we filed a motion to remand and also attached a U.S. consular certification with documents showing that the girlfriend was unmarried. At this point, the BIA could have remanded the case, having sufficient evidence showing that both are unmarried, certified by the U.S. consulate. However, in its decision denying the remand, it completely failed to mention that it heard and considered and thought about the document showing that the girlfriend was unmarried, and therefore abused its discretion. And federal rule of civil procedure, when we're dealing with authentication of a foreign record, tells us that that must comply with A2C little 2, and that section says permit the record to be evidenced by an attested summary with or without a final certification. With or without. Yes, sir. But then the so that at the time you submitted all this, it was admissible. But then you later learned, after about the third appearance, where the continuance was denied, that the IJ wanted the certification. And then you went ahead, after the continuance was denied, and it took you about 10 or whatever it was days, to go through all these channels and get the certification from the U.S. Consul General's office in that province. Yes, Your Honor. Okay. That's complicated. Anything else? Anything else, Judge Graber? No, nothing at this time. Thank you. Thank you, Your Honor. And Judge Ripple, anything else? No, thank you. Thank you. All right. Let's hear from the government. May I please support Nancy K. Cantor on behalf of the Attorney General? Your Honor, the facts of this case are simple. Petitioner seeks relief on two separate grounds based on a contradictory set of facts. In removal proceedings before the immigration judge, petitioner himself created an issue of fact concerning his marital status. He submitted, on the one hand, an asylum application indicating that he was married, and on the other hand, a separate application for adjustment of status in which he sought relief as the unmarried adult son of a U.S. citizen. Counsel, isn't it now clear that, in fact, the petitioner is not married? We have now the authenticated documents to demonstrate that. And specifically what concerns me in terms of just sort of the procedural posture of the case, the motion to remand contains the absolute demonstration of his single status. And as I understand the record, the motion to remand was not even opposed at the time. So how is it permissible for the BIA to exercise its discretion not to allow the motion to remand that finally answers the question that's the central question in the case? Well, Your Honor, I think there are two – I have two separate responses to your question. First, the question as to whether or not the immigration judge abused her discretion is whether or not on March of 2005, on the day of the hearing, petitioner had met his burden of demonstrating that he was either married or unmarried. I didn't ask you about that. I asked you about the motion to remand. Okay, Your Honor. With respect to the motion to remand, the documents submitted by – the motion to remand did not meet the legal standard for granting a remand. It was not newly submitted evidence that could not have been discovered prior to that date. The authentication was – the authenticated document was something that both the immigration judge at the October 2004 hearing and DHS in November of 2004 expressly notified petitioner of the fact that he would – he would need to properly authenticate the documents because of the question of fact he had created. Do you agree or disagree with my assertion that there was no opposition by the government to the motion to remand at the time? I do not disagree. The government did not – did not oppose the motion to remand. However, I don't believe that any legal significance can be construed based on a government's decision whether or not to join in a motion. In fact, I – Your Honor, in anticipation of that question, I contacted DHS and inquired as to what position they would have on this case at this time in 2010 versus in 2005 or 2006, and they indicated they have not received – they have not been approached at all by Petitioner's Counsel regarding a remand. Well, I'm very frustrated with this case, and I'm very frustrated, to be frank with you, with the government's position in this court because it seems to me now at least clear that the petitioner is now and was then entitled to adjustment of status, and I don't understand why there's a continued resistance to permitting his adjustment of status. I can't speak for the agency, Your Honor, but I'd like to note that any resistance to Petitioner's eligibility for adjustment of status, if you look at the timeline of the event, Petitioner's visa priority date was June of 1998. He entered the United States in 2001 on a visitor visa, which he overstayed, and he subsequently fell out of status. At all times, U.S. immigration laws were going to permit Petitioner to enter the United States and to adjust his status, as his brother successfully did. It was because Petitioner submitted two sets of documents in which he sought relief but provided contradictory facts. The immigration judge gave him, I believe, removal proceedings before the immigration judge had been ongoing for nearly three years. Well, I can understand that there was confusion in that he was seeking alternative forms of relief, as lawyers often do. You know, I wasn't in Chicago when the murder happened, but if I was in Chicago, I wasn't the killer. You know, that's what lawyers do all the time. And I guess I just, is the government now willing, without having an order of a court, to agree as a matter of mediation to simply adjust his status? I can't speak for what the agency will or will not agree to. If the court was inclined to put this case into mediation, I'd certainly speak with the agency and see if there's anything we can do. However, when I spoke to chief counsel for DHS earlier this week, they indicated that the adverse credibility finding both on the asylum, the adverse credibility finding on the asylum application and the contradictory facts when his marital status. But, see, that's, to me, a house of cards. Because once he actually has proved, as he now has, that he was not, in fact, legally married, then using that as a basis for adverse credibility just doesn't make sense to me. Well, Your Honor, it just doesn't. Sorry, if I may. The adverse credibility finding on his asylum application did not hinge upon his marital status. It was based on specific findings that went to the heart of his claim. For instance, the length of his detention, the treating that he received during the length of detention. It related to the merits of his asylum application. Okay, but would any of that, even assuming that he was legitimately denied asylum, that still doesn't remove his eligibility for adjustment, does it? Not necessarily, Your Honor. I just, I guess from past experience, I can say that DHS would be hesitant, based on the adverse credibility finding, hesitant, if not extremely reluctant, to consider reopening the case because the adverse credibility finding that went to the heart of his claims is still there. So what was that adverse credibility finding based on? Well, Your Honor, the adverse credibility finding was based on a number of inconsistencies with regards to petitioner's testimony as to his asylum claim. For example, whether he became converted to Christianity at the age of 20 or whether he converted at the age of 28, where the meetings took place at someone's house or during work, whether he was home. Well, what did he say about that? Well, Your Honor. I think he said that it was at an earlier age where he started thinking about Christianity, huh? And it wasn't until he got older that he made the final decision. Isn't that what he said? Well, Your Honor, on page 239 of the record, he says that he was 28 years old. Per his declaration in his asylum application, that's when he became a Christian. At his testimony before the immigration judge, he said first that he was always a Christian, and then he converted when he was 20. Moreover, he also stated that he was detained for five days in his asylum application at page 240 of the record, later stating before the immigration judge that it was two or three days, page 198 of the record. He also ---- Do you agree or disagree with opposing counsel's assertion, though, that if we were to order that adjustment of status be granted, we would never reach the asylum claim at all? Yes, Your Honor. If adjustment of status is ordered, the asylum claim would not be an issue. However, I believe that if the court finds that the immigration judge abuses discretion or that substantial evidence does not support the denial of adjustment of status, it should remand to the agency for consideration of the facts. For example, the immigration judge should look at all of the documents, all of the prepared additional testimony, including evidence as to what constitutes a legal marriage in China. Well, we have all this evidence before us. I mean, what was the other adverse credibility finding based on? Had something to do with handcuffs, did it?  What was that now? Absolutely, Your Honor. In his application for asylum, he indicated that he was hung up with a rope. However, during the hearing, he stated that he was handcuffed. And so you could be handcuffed by a rope. Well, Your Honor. You could be handcuffed by lots of things. You could be handcuffed by plastic. Well, Your Honor, that was just one of the immigration judge's basis for finding that his testimony with respect to his asylum application was not supported by substantial evidence. How does that go to the heart of his application? Well, it goes to the heart of his application, Your Honor, because that was petitioner was claiming that he was persecuted on account of his religious beliefs. And he was stating that detention was the persecution. So whether you are persecuted for two days or five days is a big deal. Whether you're handcuffed or tied by a rope could be something that an immigration judge could base an adverse credibility finding on. But he didn't say two days, did he? What did he say? He did. On page 198 of the record, he stated he was detained from two to three days. Well, you gave me some misinformation right now. You said two days. Well, I'm sorry, Your Honor. You've lost your credibility. I didn't mean to misrepresent that. Well, but you just lost your credibility. If you're going to apply the way you look at things, but you really haven't. But, you know, Christians get tortured in China, don't they? Don't tell me they don't because I've listened to a lot of these cases. Your Honor, the State Department's country reports indicates that Christians have been persecuted and tortured. Yeah, okay. But that doesn't mean necessarily that Petitioner has met his burden of demonstrating that he was tortured on account of his religious beliefs. Well, why did they torture him? Petitioner claims that he was tortured because he was participating in church, family church or group church meetings. Well, they get after people for that, don't they? Those home church meetings. Your Honor, I believe that there are documents in the record which indicate that that has happened before. Well, it's happened many times. We have these cases. And so he said he was handcuffed, and then he was tied up with a rope. How was he tied up? The hands behind his back? And then he was lifted? I'm not sure, Your Honor, if his hands were behind his back, but he was suspended in the air and he was struck. In his asylum application on page 211, he said he was whipped from behind. On page 195 at the immigration judge hearing, he said just that he was struck while facing a wall. Yeah. So is that contradictory? That is not contradictory on its face, Your Honor. However, there were a number of inconsistencies that the immigration judge pointed out which, on the whole, go to petitioners, the heart of petitioners' claim. So we got the handcuff thing, huh? We got the handcuff, Your Honor. And what else do we have? We have the length of detention, two to three days or five days. You just proved that you didn't go to the heart of the statement for that. Okay. What's the other one? Whether or not he was fired from work as a result of political trouble, as he claimed in his asylum application on page 240, or whether he did not go back to work because the police closed down the place in which he worked. When questioned about the difference, I believe Petitioner attempted to explain that at first he was fired and later found out that it was closed. However, that was not until he was questioned about the inconsistencies on cross-examination by the government. So he said he didn't go back to work because he was fired, and then he found out it was closed. That's what Petitioner indicated at the hearing before the immigration judge after DHS counsel questioned him on cross-examination. Unless the Court has anything else. Now, read me those passages in the transcript where the immigration judge talked about the requirement to get certain further steps to allow the admissibility of the documents that he had presented about the fact that the records showed no marriage and all that. Absolutely, Your Honor. Petitioner's application for adjustment. I want you to read them to me verbatim. I can get the record and read it to you, Your Honor. I want to know exactly what was said. I got them somewhere in my notes, but I got so many notes here, I can't find them. I understand. And I thought you would help me. On page 134, 135 of the record, Your Honor, Petitioner stated they were discussing, right. The immigration judge on the top of page 134 of the record stated, Counsel, an issue has arisen because Respondent has previously stated on his asylum application he was married. He wants to adjust, as an unmarried son, his preference, so the priorities are different. That is an issue that needs to be fully explored. Otherwise, the service will not deal with the case, and then he won't get his presuming adjustment of status. On page 135. Okay. So it doesn't, there's nothing there about requiring a counselor, a U.S. counsel, a counselor official in his home province to authenticate anything. Well, no. It doesn't. It does not, Your Honor. Okay. In October of 2004, Petitioner was just put on notice as to the critical need to resolve his marital status. Yeah, but that doesn't tell him he's got to go and get it certified. Right, Your Honor. Okay. And on December of 2004, on page 139, 140 of the record, DHS objected to, okay. On page 140 of the record, line 16, the immigration judge stated, the respondent submitted, I guess, what is a Chinese document, but it hasn't been authenticated. So the government would object as to the authenticity of this document regarding his marital status, which is a major issue in this case. Well, that's the government attorney that made that complaint. Oh, right. Sorry, Your Honor. I misspoke, Your Honor. What did he say? We need a certificate of authenticity by the U.S. Council in his home province? Your Honor. He didn't say that. No, Your Honor. It does not state that. However, 8 CFR Section 1287.6b provides the express method of obtaining authentication of official records. Well, And that's what DHS If you look at, I just read you the Federal Rules of Evidence, didn't I? Yes, you did, Your Honor. On that. And it says, permit the record to be evidenced by an attested summary with or without final certification. That's what it says here. Yes, Your Honor. In this case, though, authentication, I mean, this Court recently ruled in Batyan v. Mukasey that it's up to an immigration judge's discretion whether or not to receive authenticated documents. And in this case, the immigration judge But she finally said when she denied the continuance, you know, we have got to get an authentication or whatever the word is from the U.S. Council in China. That's what she finally told them what they wanted. And he got it within 12 days. But everything that he presented was, as far as I can see, complied with all of our Rules of Evidence. Well, Your Honor, petition was put on notice well before the March 2005 hearing of the need to provide authentication. The immigration judge denied the Show me the word authentication. You've got to get all this authenticated. And what precisely she had in mind, because the Federal Rule of Evidence doesn't seem to require that. Your Honor, the Federal Rules of Evidence in this Court say that recognize a variety of means of obtaining authentication. And on page 140 of this record, DHS objected to the document not being properly authenticated, and the immigration judge questioned Petitioner's counsel. Did DHS say it's not properly authenticated? It requires a certificate from the Council in China, U.S. Council in China? Your Honor, no. Did he say that because he probably didn't know it himself? Otherwise, he would have said it and certainly had a duty, if he knew it, to tell the immigrant about it. Your Honor, I don't know. I can't speak for what DHS counsel knew on the date of that hearing. Well, he didn't say it. No, he did not. He didn't say it. There's actually ‑‑ I want to look at that same part of the transcript, because I had a slightly different issue with it than the way Judge Pregerson is describing it, but I had a similar issue, because when the judge asked Petitioner's counsel whether she had made efforts to get that, presuming the document authenticated, counsel answered, no, Your Honor. We went through the same issue with his brother, and we submitted this to the court. There was no problem with it. So I can try and contact the Chinese authorities to authenticate it. And the judge says, I think you should make an attempt at least, okay, and return later. So counsel was left with the clear impression that getting something from Chinese authorities, not the American consulate, was what was being asked. So I guess that's where I think the confusion came up to my mind. Well, I think the response to that, Your Honor, is that on the date of the March 2005 hearing, Petitioner's counsel did not have the properly authenticated documents, and the request for a continuance was not ‑‑ they did not request a continuance until after the merits hearing had been concluded. The immigration judge, we don't know whether the immigration judge might have ruled differently, had the continuance been ‑‑ had their efforts to authenticate the document and the request for a continuance been submitted at the beginning of the hearing, prior to all of the merits testimony taking place. Given that the removal proceedings had been ongoing for three years, and that this was the eighth hearing before the immigration judge, I don't know what DHS counsel knew or what ‑‑ I can't speak for what the immigration judge or the agency below were contemplating during that exchange. However, the regulations are clear as to what authentication requires. Well, they complied with it. Complied with it. Excuse me, Your Honor. After the fact, but not on the date of the hearing. No, no, no. You mean every document needs to be authenticated by the counselor in the foreign country? Your Honor, that was not until after the merits ‑‑ after the March 2005 hearing had taken place. 8 CFR 128. No, no. But what are you saying? Sorry? Are you saying that ‑‑ what do you mean after the March? Well, on the date of the March 2005 hearing, Petitioner had documents from the Chinese Family Planning Commission. And I believe the documents from Chinese authorities. However, 8 CFR 128.7.6B states ‑‑ That were authenticated by Chinese authorities. No, Your Honor. It says official records shall be evidenced by a copy attested by an officer in the foreign service of the United States, stationed in the foreign country where the record is kept. So the problem on the date of the March 2005 hearing was that Petitioner did not have documents that were certified by the U.S. consulate in China, which is what the regulations require. But we have our federal rules of evidence. They don't count. They do count, Your Honor, but that doesn't ‑‑ the federal rules in this Court's recent holding in Vatian is that while those are ways of ‑‑ there are a number of ways of authenticating documents, that does not mean the immigration judge must accept the documents. Well, the immigration judge did accept the brother's documents. In the brother's case, however, the brother had not ‑‑ Is that true or false? I don't know what happened. I don't have a record of that. You don't know anything about the brother? I know the brother's status was adjusted based on Petitioner's states, the same documents submitted in this case. And we have no reason to dispute that. No, but in that case, there wasn't an issue of fact created by the Petitioner regarding his marital status. And in this case, it was ‑‑ He explained it. He explained it. He said that they had this party and, you know, in the eyes of the folks in this area, they were considered a couple. And he didn't ‑‑ to be married, you've got to go and do other things. It's just like here, you know, people consider themselves married and they never bother to get a marriage certificate. Well, Your Honor, with all due respect, I think there is a big difference between an explanation  And in this case, because of the issue of fact created by Petitioner and the fact that the immigration judge and DHS had notified Petitioner of the need to resolve this issue with authentication, I don't believe that it can be said the immigration judge abused her discretion. Where did she say you have to resolve this by authentication? Your Honor, on October 14, 2004, I just read that Part 2. It's a two‑part analysis, but on October 14, 2004, Petitioner's counsel notified that this would be a critical issue that needed to be resolved, the issue of Petitioner's marital status. And then in December of 2004 ‑‑ But she doesn't use the word authentication. It needs to be resolved. So they followed all this stuff. Right, but again, Your Honor, two months later in December of 2004 ‑‑ See, you told me you'd use the word authentication. But it's not in her language. Your Honor, the authentication language comes from December of 2004, where the immigration judge expressly asked Petitioner whether or not any attempts had been made to authenticate the documents. And so it's a two‑part analysis. One, Petitioner had to ‑‑ Well, she used that word. Excuse me? She used the word authenticate. The immigration judge used the word authenticate on page 140 of the record in December 9, 2004. And what was that hearing about? That hearing, it was continued removal hearings. Yeah, that was the last hearing they had. Before the merits hearing? Yes. That was the second to the last hearing. Yeah. In any event, unless the Court has any further questions. And she didn't say where it had to go. And, you know, whatever the federal rules of evidence required were satisfied. Okay. Are you from Washington? No, I'm not, Your Honor. I'm from L.A., actually. From the U.S. Attorney's Office in L.A.? Oh, I'm sorry. I am from Washington. I am with the Department of Justice in D.C. I asked you if you were from Washington. I thought you were asking me where I'm originally from, and I grew up. I went to Arcadia High School, so. Where did you go to high school? Arcadia High School. Arcadia High School, yeah. So this is very familiar territory for me. All right. So you're from Washington, D.C.? Correct, Your Honor. All right. So you've explained it. Thank you, Your Honor. Okay. Thanks. Thank you. You want to give us a ñ just do it fast. Your Honor, as to your previous question as to whether now, even if he were to be married now, whether he would qualify for a visa, and the answer is yes, that if he was married now, he would still qualify for a visa right now. Well, I do weddings, too. You do swearing and ceremonies? Which one of these guys is the ñ General? All right. Looks like a pretty nice fellow to me. Your Honors, I'm not going to belabor the authentication, since it seems like I'd already explained the sequence of events from the master calendar hearing of October to December, then to the merits hearing in March of 2005. What I would like to address briefly would be the credibility determination. We believe that the BIA's adverse credibility determinations are not based on substantial evidence. Each of the five outlined alleged inconsistencies by the judge we believe are actually, if looked at the record carefully, are not inconsistencies at all. And even if they were to be inconsistencies, they're not material and do not go to the heart of the claim. And this court repeatedly has stated that it is very cautious in giving seeming inconsistencies undue weight, especially where there's a language barrier. Looking at the record, one can see that many of the responses were nonsensical, that the grammar and the syntax in the questions and the responses were not correct, therefore making it very difficult and unclear sometimes to understand the responses. However, if I could go through each of the inconsistencies mentioned. Oh, and most important, in addition to that, was that the brother who was at the hearing could have corroborated the claim and could have cleared up any kinds of alleged inconsistencies that the judge may have thought about. However, the brother was excluded. He was not allowed to testify. That also was an abuse of petitioner's due process. There was no sequestration order in effect at the asylum portion of the hearing. The brother and the other witnesses were sequestered at the beginning of the adjustment portion of the hearing. Then one by one they came in, gave their testimony, whereupon the judge then stated, When the judge then pressed petitioner into an asylum hearing, it was incumbent on DHS counsel to then renew any kind of sequestration order, which they did not do so, therefore there was no sequestration order in effect. Even if a sequestration order had been in effect, the U.S. Supreme Court in Hobbs stated that it warned against excluding witnesses because it was such a grave due process violation to not allow witnesses to testify and to let the petitioner fully develop the record. Going to the inconsistencies, first about the torture, that alleged inconsistency is not supported by substantial evidence. Your Honor, you stated that in cross-examination, he explained that his hands were tied with a rope of some sort, that he was handcuffed as if handcuffed, and that he then was beaten and lost consciousness. Any kind of unclarity could have been attributed to language barriers. As if handcuffed. As if handcuffed, yes, Your Honor. It's important to take into consideration language barriers, especially a difficult language like Chinese. Further, the conversion to Christianity, also, there are no inconsistencies per se. Taking on a religion, when somebody is born with no religion in a country where there is no religion and one takes on religion, it's a continuum, it's a process. And the declaration, the testimony, and the cross-examination show the process. In his testimony, he stated that he was not born with a religion and that he later became a Christian. He then stated he was introduced to Christianity at the age of 20, while he was working and while his parents were abroad and giving him information about a system of religion, here Christianity. Then later he stated in 1999, when he was 28 years old, Wei Kuan started working, a Christian, started working at his place of work, and then he started inviting him to his house, and that began a process of becoming more knowledgeable and having meetings about Christianity. And that he then finally converted, was baptized officially in 2000. So there actually are no inconsistencies, it's a continuum. And his questioning and answers tell a whole story of how the process led to him becoming a Christian. Another inconsistency that was talked about was the length of detention. The declaration stated that he was detained for five days. His testimony, when asked, how long were you interrogated for? A totally different question. How long were you interrogated for? He stated two to three days. On cross-examination he was asked, how long were you actually detained for? Was it two to three days or five days? And he said, three to five days. This issue doesn't, even if this is an inconsistency, it doesn't go to the heart of the claim. Because it's not wholly inconsistent. It's very plausible that detainees lose track of time. As a matter of fact, detention is designed for detainees to lose track of time. Especially, he lost consciousness, he was beaten. And it may be plausible that he actually never even knew the exact amount of days that he was detained. Furthermore, the judge injected her own speculation and conjecture in making explanations about how torture affects the memory of torture victims. Furthermore, being fired from work, this also was clarified that there was a sequence of events. That first he was detained, he was in so much pain he couldn't go to work for a month. He then received a letter stating he was fired from work. Later on, he called his place of work for whatever reason and found out that because of the continuous illegal religious activities at the place of work, the place of work had closed down. So, there again is really no inconsistency. And the cross, he again showed a sequence and he told a story of how, of the events that took place. Again, this Court is very cautious in giving undue weight to seeming inconsistencies when there's a language barrier. Okay. You're a very good lawyer. Thank you, Your Honor. So is counsel for the government. Okay. From Arcadia. Any further questions? No. Where are you from? I'm from L.A. also. Washington, D.C.? No, Santa Monica. Okay. All right. Okay. The matter will stand submitted. Thank you, Counsel. And the Court will adjourn. Thank you. All rise for the decision to adjourn.
judges: Pregerson, Ripple, Graber